McNABB et al. v. UNITED STATES.

No. 25.  Argued October 22, 1942.—Decided March 1, 1943.

Mr. E. B. Baker, with whom Messrs. W. H. Norvell, J. M. C. Townsend, and Wilkes T. Thrasher were on the brief, for petitioners.

*Assistant Attorney General Berge,* with whom *Solicitor General Fahy* and *Messrs. Oscar A. Provost* and *Archibald Cox,* and *Miss Melva M. Graney* were on the brief, for the United States.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The petitioners are under sentence of imprisonment for forty-five years for the murder of an officer of the Alcohol Tax Unit of the Bureau of Internal Revenue engaged in the performance of his official duties. (18 U. S. C. § 253.) They were convicted of second-degree murder in the District Court for the Eastern District of Tennessee, and on appeal to the Circuit Court of Appeals for the Sixth Circuit the convictions were sustained. 123 F. 2d 848. We brought the case here because the petition for certiorari presented serious questions in the administration of federal criminal justice. 316 U. S. 658. Determination of these questions turns upon the circumstances relating to the admission in evidence of incriminating statements made by the petitioners.

On the afternoon of Wednesday, July 31, 1940, information was received at the Chattanooga office of the Alcoholic Tax Unit that several members of the McNabb family were planning to sell that night whiskey on which federal taxes had not been paid. The McNabbs were a clan of Tennessee mountaineers living about twelve miles from Chattanooga in a section known as the McNabb Settlement. Plans were made to apprehend the McNabbs while actually engaged in their illicit enterprise. That evening four revenue agents, accompanied by the Government's informers, drove to the McNabb Settlement. When they approached the rendezvous arranged between the Mc-Nabbs and the informers, the officers got out of the car. The informers drove on and met five of the McNabbs, of whom three—the twin brothers Freeman and Raymond, and their cousin Benjamin—are the petitioners here.

(The two others, Emuil and Barney McNabb, were acquitted at the direction of the trial court.) The group proceeded to a spot near the family cemetery where the liquor was hidden. While cans containing whiskey were being loaded into the car, one of the informers flashed a prearranged signal to the officers who thereupon came running. One of these called out, "All right, boys, federal officers!", and the McNabbs took flight.

Instead of pursuing the McNabbs, the officers began to empty the cans. They heard noises coming from the direction of the cemetery, and after a short while a large rock landed at their feet. An officer named Leeper ran into the cemetery. He looked about with his flashlight but discovered no one. Noticing a couple of whiskey cans there, he began to pour out their contents. Shortly afterwards the other officers heard a shot; running into the cemetery they found Leeper on the ground, fatally wounded. A few minutes later—at about ten o'clock— he died without having identified his assailant. A second shot slightly wounded another officer. A search of the cemetery proved futile, and the officers left.

About three or four hours later—between one and two o'clock Thursday morning—federal officers went to the home of Freeman, Raymond, and Emuil McNabb and there placed them under arrest. Freeman and Raymond were twenty-five years old. Both had lived in the Settlement all their lives; neither had gone beyond the fourth grade in school; neither had ever been farther from his home than Jasper, twenty-one miles away. Emuil was twenty-two years old. He, too, had lived in the Settlement all his life, and had not gone beyond the second grade.

Immediately upon arrest, Freeman, Raymond, and Emuil were taken directly to the Federal Building at Chattanooga. They were not brought before a United States commissioner or a judge. Instead, they were placed in a detention room (where there was nothing they

could sit or lie down on, except the floor), and kept there for about fourteen hours, from three o'clock Thursday morning until five o'clock that afternoon. They were given some sandwiches. They were not permitted to see relatives and friends who attempted to visit them. They had no lawyer. There is no evidence that they requested the assistance of counsel, or that they were told that they were entitled to such assistance.

Barney McNabb, who had been arrested early Thursday morning by the local police, was handed over to the federal authorities about nine or ten o'clock that morning. He was twenty-eight years old; like the other McNabbs he had spent his entire life in the Settlement, had never gone beyond Jasper, and his schooling stopped at the third grade. Barney was placed in a separate room in the Federal Building where he was questioned for a short period. The officers then took him to the scene of the killing, brought him back to the Federal Building, questioned him further for about an hour, and finally removed him to the county jail three blocks away.

In the meantime, direction of the investigation had been assumed by H. B. Taylor, district supervisor of the Alcohol Tax Unit, with headquarters at Louisville, Kentucky. Taylor was the Government's chief witness on the central issue of the admissibility of the statements made by the McNabbs. Arriving in Chattanooga early Thursday morning, he spent the day in study of the case before beginning his interrogation of the prisoners. Freeman, Raymond, and Emuil, who had been taken to the county jail about five o'clock Thursday afternoon, were brought back to the Federal Building early that evening. According to Taylor, his questioning of them began at nine o'clock. Other officers set the hour earlier.[1]

---

[1] Officer Burke testified that the questioning Thursday night began at 6 P. M., Officer Kitts, at 7 P. M., and Officer Jakes, at "possibly 6 or 7 o'clock."

Throughout the questioning, most of which was done by Taylor, at least six officers were present. At no time during its course was a lawyer or any relative or friend of the defendants present. Taylor began by telling "each of them before they were questioned that we were Government officers, what we were investigating, and advised them that they did not have to make a statement, that they need not fear force, and that any statement made by them would be used against them, and that they need not answer any questions asked unless they desired to do so."

The men were questioned singly and together. As described by one of the officers, "They would be brought in, be questioned possibly at various times, some of them half an hour, or maybe an hour, or maybe two hours." Taylor testified that the questioning continued until one o'clock in the morning, when the defendants were taken back to the county jail.[2]

The questioning was resumed Friday morning, probably sometime between nine and ten o'clock.[3] "They were brought down from the jail several times, how many I don't know. They were questioned one at a time, as we would finish one he would be sent back and we would try to reconcile the facts they told, connect up the statements they made, and then we would get two of them together. I think at one time we probably had all five together trying to reconcile their statements . . . When

---

[2] Here again Taylor's testimony is at variance with that of other officers. Officer Kitts estimated that the questioning Thursday night ended at 10 P. M., Officer Burke, at 11 P. M., and Officer Jakes, at midnight. No officer testified that the questioning that night lasted less than three hours.

[3] Taylor testified that the McNabbs were brought back Friday morning "probably about nine or nine-thirty." None of the other officers could recall the exact time. Officer Burke thought "it must have been after nine o'clock," while Officer Jakes guessed that it was "somewhere around ten or eleven o'clock in the morning."

I knew the truth I told the defendants what I knew. I never called them damned liars, but I did say they were lying to me. . . . It would be impossible to tell all the motions I made with my hands during the two days of questioning, however, I didn't threaten anyone. None of the officers were prejudiced towards these defendants nor bitter toward them. We were only trying to find out who killed our fellow officer."

Benjamin McNabb, the third of the petitioners, came to the office of the Alcohol Tax Unit about eight or nine o'clock Friday morning and voluntarily surrendered. Benjamin was twenty years old, had never been arrested before, had lived in the McNabb Settlement all his life, and had not got beyond the fourth grade in school. He told the officers that he had heard that they were looking for him but that he was entirely innocent of any connection with the crime. The officers made him take his clothes off for a few minutes because, so he testified, "they wanted to look at me. This scared me pretty much." [4] He was not taken before a United States Commissioner or a judge. Instead, the officers questioned him for about five or six hours. When finally in the afternoon he was confronted with the statement that the others accused him of having fired both shots, Benjamin said, "If they are going to accuse me of that, I will tell the whole truth; you may get your pencil and paper and write it down." He then confessed that he had fired the first shot, but denied that he had also fired the second.

Because there were "certain discrepancies in their stories, and we were anxious to straighten them out," the

---

[4] Taylor testified that the reason for having Benjamin remove his clothes was that "I was informed that he had gotten an injury running through the woods or that he had been hit by a stray shot. We didn't know whether or not this was true, and asked him to take his clothes off in order to examine him and find out."

defendants were brought to the Federal Building from the jail between nine and ten o'clock Friday night. They were again questioned, sometimes separately, sometimes together. Taylor testified that "We had Freeman McNabb on the night of the second [Friday] for about three and one-half hours. I don't remember the time but I remember him particularly because he certainly was hard to get anything out of. He would admit he lied before, and then tell it all over again. I knew some of the things about the whole truth and it took about three and one-half hours before he would say it was the truth, and I finally got him to tell a story which he said was true and which certainly fit better with the physical facts and circumstances than any other story he had told. It took me three and one-half hours to get a story that was satisfactory or that I believed was nearer the truth than when we started."

The questioning of the defendants continued until about two o'clock Saturday morning, when the officers finally "got all the discrepancies straightened out." Benjamin did not change his story that he had fired only the first shot. Freeman and Raymond admitted that they were present when the shooting occurred, but denied Benjamin's charge that they had urged him to shoot. Barney and Emuil, who were acquitted at the direction of the trial court, made no incriminating admissions.

Concededly, the admissions made by Freeman, Raymond and Benjamin constituted the crux of the Government's case against them, and the convictions cannot stand if such evidence be excluded. Accordingly, the question for our decision is whether these incriminating statements, made under the circumstances we have summarized,[5] were properly admitted. Relying upon the

---

[5] To determine the admissibility of the statements secured from the defendants while they were in the custody of the federal officers, the trial court conducted a preliminary examination in the absence of

guarantees of the Fifth Amendment that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law," the petitioners contend that the Constitution itself forbade the use of this evidence against them. The Government counters by urging that the Constitution proscribes only "involuntary" confessions, and that judged by appropriate criteria of "voluntariness" the petitioners' admissions were voluntary and hence admissible.

It is true, as the petitioners assert, that a conviction in the federal courts, the foundation of which is evidence obtained in disregard of liberties deemed fundamental by the Constitution, cannot stand. *Boyd* v. *United States,* 116 U. S. 616; *Weeks* v. *United States,* 232 U. S. 383; *Gouled* v. *United States,* 255 U. S. 298; *Amos* v. *United States,* 255 U. S. 313; *Agnello* v. *United States,* 269 U. S. 20; *Byars* v. *United States,* 273 U. S. 28; *Grau* v. *United*

---

the jury. After hearing the evidence (consisting principally of the testimony of the defendants and the officers), the court concluded that the statements were admissible. An exception to this ruling was taken. When the jury was recalled, the witnesses for the Government repeated their testimony. The defendants rested upon their claim that the trial court erred in admitting these statements, and stood on their constitutional right not to take the witness stand before the jury. At the conclusion of the Government's case the defendants moved to exclude from the consideration of the jury the evidence relating to the admissions made by them. This motion was denied. The motion was renewed at the conclusion of the defendants' case, and again was denied. The court charged the jury that the defendants' admissions should be disregarded if found to have been involuntarily made. The issue of law which was decided by the trial court in admitting the statements made by the petitioners did not become, therefore, a question of fact foreclosed by the jury's general verdict of guilty. Under these circumstances we have treated as facts only the testimony offered on behalf of the Government and so much of the petitioners' evidence as is neither contradicted by nor inconsistent with that of the Government.

*States,* 287 U. S. 124. And this Court has, on Constitutional grounds, set aside convictions, both in the federal and state courts, which were based upon confessions "secured by protracted and repeated questioning of ignorant and untutored persons, in whose minds the power of officers was greatly magnified," *Lisenba* v. *California,* 314 U. S. 219, 239–40, or "who have been unlawfully held incommunicado without advice of friends or counsel," *Ward* v. *Texas,* 316 U. S. 547, 555, and see *Brown* v. *Mississippi,* 297 U. S. 278; *Chambers* v. *Florida,* 309 U. S. 227; *Canty* v. *Alabama,* 309 U. S. 629; *White* v. *Texas,* 310 U. S. 530; *Lomax* v. *Texas,* 313 U. S. 544; *Vernon* v. *Alabama,* 313 U. S. 547.

In the view we take of the case, however, it becomes unnecessary to reach the Constitutional issue pressed upon us. For, while the power of this Court to undo convictions in state courts is limited to the enforcement of those "fundamental principles of liberty and justice," *Hebert* v. *Louisiana,* 272 U. S. 312, 316, which are secured by the Fourteenth Amendment, the scope of our reviewing power over convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity. Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as "due process of law" and below which we reach what is really trial by force. Moreover, review by this Court of state action expressing its notion of what will best further its own security in the administration of criminal justice demands appropriate respect for the deliberative judgment of a state in so basic an exercise of its jurisdiction. Considerations of large policy in making the necessary accommodations in our federal system are wholly irrele-

vant to the formulation and application of proper standards for the enforcement of the federal criminal law in the federal courts.

The principles governing the admissibility of evidence in federal criminal trials have not been restricted, therefore, to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts, see *Nardone* v. *United States*, 308 U. S. 338, 341–42, this Court has, from the very beginning of its history, formulated rules of evidence to be applied in federal criminal prosecutions. *E. g., Ex parte Bollman & Swartwout*, 4 Cranch 75, 130–31; *United States* v. *Palmer*, 3 Wheat. 610, 643–44; *United States* v. *Furlong*, 5 Wheat. 184, 199; *United States* v. *Gooding*, 12 Wheat. 460, 468–70; *United States* v. *Wood*, 14 Pet. 430; *United States* v. *Murphy*, 16 Pet. 203; *Funk* v. *United States*, 290 U. S. 371; *Wolfle* v. *United States*, 291 U. S. 7; see 1 Wigmore on Evidence (3d ed. 1940) pp. 170–97; Note, 47 Harv. L. Rev. 853.[6] And in formulating such rules of evidence for federal criminal trials the Court has been guided by considerations of justice not limited to the strict canons of evidentiary relevance.

Quite apart from the Constitution, therefore, we are constrained to hold that the evidence elicited from the petitioners in the circumstances disclosed here must be excluded. For in their treatment of the petitioners the arresting officers assumed functions which Congress has

---

[6] The function of formulating rules of evidence in areas not governed by statute has always been one of the chief concerns of courts: "The rules of evidence on which we practise today have mostly grown up at the hands of the judges; and, except as they may be really something more than rules of evidence, they may, in the main, properly enough be left to them to be modified and reshaped." J. B. Thayer, A Preliminary Treatise on Evidence at the Common Law (1898) pp. 530–31.

explicitly denied them. They subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding. Congress has explicitly commanded that "It shall be the duty of the marshal, his deputy, or other officer, who may arrest a person charged with any crime or offense, to take the defendant before the nearest United States commissioner or the nearest judicial officer having jurisdiction under existing laws for a hearing, commitment, or taking bail for trial . . ." 18 U. S. C. § 595. Similarly, the Act of June 18, 1934, c. 595, 48 Stat. 1008, 5 U. S. C. § 300a, authorizing officers of the Federal Bureau of Investigation to make arrests, requires that "the person arrested shall be immediately taken before a committing officer." Compare also the Act of March 1, 1879, c. 125, 20 Stat. 327, 341, 18 U. S. C. § 593, which provides that when arrests are made of persons in the act of operating an illicit distillery, the arrested persons shall be taken forthwith before some judicial officer residing in the county where the arrests were made, or if none, in the county nearest to the place of arrest. Similar legislation, requiring that arrested persons be promptly taken before a committing authority, appears on the statute books of nearly all the states.[7]

---

[7] Alabama—Code, 1940, Tit. 15, § 160; Arizona—Code, 1939, §§ 44–107, 44–140, 44–141; Arkansas—Digest of Statutes, 1937, §§ 3729, 3731; California—Penal Code, 1941, §§ 821–29, 847–49; Colorado—Statutes, 1935, c. 48, § 428; Connecticut—Gen. Stats., 1930, § 239; Delaware—Rev. Code, 1935, §§ 4456, 5173; District of Columbia—Code, 1940, §§ 4–140, 23–301; Florida—Statutes, 1941, §§ 901.06, 901.23; Georgia—Code, 1933, §§ 27–210, 27–212; Idaho—Code, 1932, §§ 19–515, 19–518, 19–614, 19–615; Illinois—Rev. Stats., 1941, c. 38, §§ 655, 660; Indiana—Baldwin's Stats. Ann., 1934, § 11484; Iowa—Code, 1939, §§ 13478, 13481, 13486, 13488; Kansas—Gen. Stats.,

The purpose of this impressively pervasive requirement of criminal procedure is plain. A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication. Legisla-

1935, § 62–610; Kentucky—Code, 1938, §§ 45–46; Louisiana—Code of Criminal Procedure, 1932, §§ 66, 79, 80; Maine—Rev. Stats., 1930, c. 145, § 9; Massachusetts—Gen. Laws, 1932, c. 276, §§ 22, 29, 34; Michigan—Stats. Ann., 1938, §§ 28.863, 28.872, 28.873, 28.885; Minnesota—Mason's Stats., 1927, c. 104, §§ 10575, 10581; Mississippi—Code, 1930, c. 21, § 1230; Missouri—Rev. Stats., 1939, §§ 3862, 3883; Montana—Rev. Code, 1935, §§ 11731, 11739–40; Nebraska—Comp. Stats., 1929, § 29–412; Nevada—Comp. Laws, 1929, §§ 10744–48, 10762–64; New Hampshire—Pub. Laws, 1926, c. 364, § 13; New Jersey—Rev. Stats., 1937, § 2:216–9; New York—Code of Criminal Procedure, 1939, §§ 158–59, 165, 185; North Carolina—Code, 1939, §§ 4528, 4548; North Dakota—Comp. Laws, 1913, §§ 10543, 10548, 10576, 10578; Ohio—Throckmorton's Code, 1940, §§ 13432–3, 13432–4; Oklahoma—Statutes, 1941, Tit. 22, §§ 176–77, 181, 205; Oregon—Code, 1930, §§ 13–2117, 13–2201; Pennsylvania—Purdon's Stats. Ann., Perm. ed., Tit. 19, §§ 3, 4; Rhode Island—Gen. Laws 1938, c. 625, § 68; South Carolina—Code, 1942, §§ 907, 920; South Dakota—Code, 1939, §§ 34.1608, 34.1619–24; Tennessee—Michie's Code, 1938, §§ 11515, 11544; Texas—Code of Criminal Procedure, 1936, Arts. 233–35; Utah—Rev. Stats., 1933, §§ 105-4-4, 105-4-5, 103–26–51; Virginia—Code, 1942, §§ 4826, 4827a; Washington—Rev. Stats., 1932, § 1949; West Virginia—Code, 1937, § 6150; Wisconsin—Statutes, 1941, § 361.08; Wyoming—Rev. Stats., 1931, §§ 33–108, 33–110, 33–115.

tion such as this, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard— not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the "third degree" which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement. It outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection.[8] A statute carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application.

The circumstances in which the statements admitted in evidence against the petitioners were secured reveal a plain disregard of the duty enjoined by Congress upon federal law officers. Freeman and Raymond McNabb were arrested in the middle of the night at their home. Instead of being brought before a United States commissioner or a judicial officer, as the law requires, in order to determine the sufficiency of the justification for their de-

---

[8] "During the discussions which took place on the Indian Code of Criminal Procedure in 1872 some observations were made on the reasons which occasionally lead native police officers to apply torture to prisoners. An experienced civil officer observed, 'There is a great deal of laziness in it. It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence.' This was a new view to me, but I have no doubt of its truth." Sir James Fitzjames Stephen, A History of the Criminal Law of England (1883), vol. 1, p. 442 note. Compare §§ 25 and 26 of the Indian Evidence Act (1872).

tention, they were put in a barren cell and kept there for fourteen hours. For two days they were subjected to unremitting questioning by numerous officers. Benjamin's confession was secured by detaining him unlawfully and questioning him continuously for five or six hours. The McNabbs had to submit to all this without the aid of friends or the benefit of counsel. The record leaves no room for doubt that the questioning of the petitioners took place while they were in the custody of the arresting officers and before any order of commitment was made. Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law. Congress has not explicitly forbidden the use of evidence so procured. But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law.

Unlike England, where the Judges of the King's Bench have prescribed rules for the interrogation of prisoners while in the custody of police officers,[9] we have no specific

---

[9] In 1912 the Judges of the King's Bench, at the request of the Home Secretary, issued rules for the guidance of police officers. See *Rex* v. *Voisin*, L. R. [1918] 1 K. B. 531, 539. These rules were amended in 1918, and in 1930 a circular was issued by the Home Office, with the approval of the Judges, in order to clear up difficulties in their construction. 6 Police Journal (1933) 352–56, containing the texts of the Judge's Rules and the Circular. See Report of the Royal Commission on Police Powers and Procedure (1929) Cmd. 3297. Although the Rules do not have the force of law, *Rex* v. *Voisin, supra,* the English courts insist that they be strictly observed before admitting statements made by accused persons while in the custody of the police. See 1 Taylor on Evidence (12th ed. 1931), pp. 556–62; "Questioning an Accused Person," 92 Justice of the Peace and Local Government Review 743, 758 (1928); Keedy, Preliminary Examination of Accused Persons in England, 73 Proceedings of American Philosophical Society

provisions of law governing federal law enforcement officers in procuring evidence from persons held in custody. But the absence of specific restraints going beyond the legislation to which we have referred does not imply that the circumstances under which evidence was secured are irrelevant in ascertaining its admissibility. The mere fact that a confession was made while in the custody of the police does not render it inadmissible. Compare *Hopt* v. *Utah*, 110 U. S. 574; *Sparf* v. *United States*, 156 U. S. 51, 55; *United States ex rel. Bilokumsky* v. *Tod*, 263 U. S. 149, 157; *Wan* v. *United States*, 266 U. S. 1, 14. But where in the course of a criminal trial in the federal courts it appears that evidence has been obtained in such violation of legal rights as this case discloses, it is the duty of the trial court to entertain a motion for the exclusion of such evidence and to hold a hearing, as was done here, to determine whether such motion should be granted or denied. Cf. *Gouled* v. *United States*, 255 U. S. 298, 312–13; *Amos* v. *United States*, 255 U. S. 313; *Nardone* v. *United States*, 308 U. S. 338, 341–42. The interruption of the trial for this purpose should be no longer than is required for a competent determination of the substantiality of the motion. As was observed in the *Nardone* case, *supra*, "The civilized conduct of criminal trials cannot be confined within mechanical rules. It necessarily demands the authority of limited direction entrusted to the judge presiding in federal trials, including a well-established range of judicial discretion, subject to appropriate review on appeal, in ruling upon preliminary questions of fact. Such a system as ours must, within the

103 (1934). For a dramatic illustration of the English attitude towards interrogation of arrested persons by the police, see Inquiry in Regard to the Interrogation by the Police of Miss Savidge (1928), Cmd. 3147.

limits here indicated, rely on the learning, good sense, fairness and courage of federal trial judges." 308 U. S. at 342.

In holding that the petitioners' admissions were improperly received in evidence against them, and that having been based on this evidence their convictions cannot stand, we confine ourselves to our limited function as the court of ultimate review of the standards formulated and applied by federal courts in the trial of criminal cases. We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement. We hold only that a decent regard for the duty of courts as agencies of justice and custodians of liberty forbids that men should be convicted upon evidence secured under the circumstances revealed here. In so doing, we respect the policy which underlies Congressional legislation. The history of liberty has largely been the history of observance of procedural safeguards. And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law.

*Reversed.*

Mr. Justice Rutledge took no part in the consideration or decision of this case.

Mr. Justice Reed, dissenting:

I find myself unable to agree with the opinion of the Court in this case. An officer of the United States was killed while in the performance of his duties. From the circumstances detailed in the Court's opinion, there was obvious reason to suspect that the petitioners here were implicated in firing the fatal shot from the dark. The arrests followed. As the guilty parties were known only to the McNabbs who took part in the assault at the bury-

ing ground, it was natural and proper that the officers would question them as to their actions.[1]

The cases just cited show that statements made while under interrogation may be used at a trial if it may fairly be said that the information was given voluntarily. A frank and free confession of crime by the culprit affords testimony of the highest credibility and of a character which may be verified easily. Equally frank responses to officers by innocent people arrested under misapprehension give the best basis for prompt discharge from custody. The realization of the convincing quality of a confession tempts officials to press suspects unduly for such statements. To guard accused persons against the danger of being forced to confess, the law admits confessions of guilt only when they are voluntarily made. While the connotation of voluntary is indefinite, it affords an understandable label under which can be readily classified the various acts of terrorism, promises, trickery and threats which have led this and other courts to refuse admission as evidence to confessions.[2] The cases cited in the Court's opinion show the broad coverage of this rule of law. Through it those coerced into confession have found a ready defense from injustice.

Were the Court today saying merely that in its judgment the confessions of the McNabbs were not voluntary, there would be no occasion for this single protest. A notation of dissent would suffice. The opinion, however, does more. Involuntary confessions are not constitu-

---

[1] *Hopt* v. *Utah*, 110 U. S. 574, 584; *Sparf and Hansen* v. *United States*, 156 U. S. 51, 55; *Pierce* v. *United States*, 160 U. S. 355; *Wilson* v. *United States*, 162 U. S. 613, 623; cf. *Bilokumsky* v. *Tod*, 263 U. S. 149, 157.

[2] "In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort." *Wilson* v. *United States*, 162 U. S. 613, 623; *Lisenba* v. *California*, 314 U. S. 219, 239.

tionally admissible because violative of the provision of self-incrimination in the Bill of Rights. Now the Court leaves undecided whether the present confessions are voluntary or involuntary and declares that the confessions must be excluded because in addition to questioning the petitioners, the arresting officers failed promptly to take them before a committing magistrate. The Court finds a basis for the declaration of this new rule of evidence in its supervisory authority over the administration of criminal justice. I question whether this offers to the trial courts and the peace officers a rule of admissibility as clear as the test of the voluntary character of the confession. I am opposed to broadening the possibilities of defendants escaping punishment by these more rigorous technical requirements in the administration of justice. If these confessions are otherwise voluntary, civilized standards, in my opinion, are not advanced by setting aside these judgments because of acts of omission which are not shown to have tended toward coercing the admissions.

Our police officers occasionally overstep legal bounds. This record does not show when the petitioners were taken before a committing magistrate. No point was made of the failure to commit by defendant or counsel. No opportunity was given to the officers to explain. Objection to the introduction of the confessions was made only on the ground that they were obtained through coercion. This was determined against the accused both by the court, when it appraised the fact as to the voluntary character of the confessions preliminarily to determining the legal question of their admissibility, and by the jury. The court saw and heard witnesses for the prosecution and the defense. The defendants did not take the stand before the jury. The uncontradicted evidence does not require a different conclusion. The officers of the Alcohol Tax Unit should not be disciplined by overturning this conviction.