STATE, Respondent, vs. BABICH, Appellant.*

*December 8, 1950—January 9, 1951.*

---

* Motion for rehearing denied, without costs, on March 6, 1951.

292

For the appellant there was a brief by *A. W. Richter* and *Edward T. Berkanovic,* both of Milwaukee, and oral argument by *Mr. Richter.*

For the respondent there was a brief by the *Attorney General, William A. Platz,* assistant attorney general, *William J. McCauley,* district attorney of Milwaukee county, and *Joseph E. Tierney,* deputy district attorney, and oral argument by *Mr. McCauley, Mr. Tierney,* and *Mr. Platz.*

HUGHES, J. We have studied the record carefully in the light of appellant's contentions and find that none is sustained.

## I.

We will treat first the contention that the trial court erred in admitting confessions made while appellant was in the custody of the Milwaukee police and without being brought before a magistrate.

Sec. 8, art. I of the Wisconsin constitution provides, so far as material:

"No person shall be held to answer for a criminal offense without due process of law, and no person for the same offense shall be put twice in jeopardy of punishment, nor shall be compelled in any criminal case to be a witness against himself. . . ."

Sec. 360.02, Stats. 1947, provides for issuance of warrants upon proper complaint and continues:

". . . and if it shall appear that such offense has been committed the said justice shall issue his warrant, reciting the substance of the complaint, and requiring the officer to whom it is directed forthwith to arrest the accused and bring him before such justice, or some other justice of the same county, to be dealt with according to law. . . ."

The material provisions of the Fourteenth amendment of the United States constitution are:

". . . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; . . ."

There is obviously no conflict in the federal and state protections sought to be preserved.

The appellant contends that his conviction is in violation of the due-process clause of the federal constitution because the confessions made by him were obtained by duress and illegal detention in the custody of the Milwaukee police.

There is no difficulty in understanding the substance of the law, but difficulties do arise in its application. Appellant maintains that the decision in *Malinski v. New York* (1945), 324 U. S. 401, 65 Sup. Ct. 781, 89 L. Ed. 1029, renders admissions and confessions of the appellant inadmissible as evidence and requires reversal of the conviction.

In the *Malinski Case,* one of murder in committing a robbery, the defendant was arrested while on his way to

work on the morning of Friday, October 23, 1942. The police did not arraign him but took him to a room in the Bossert Hotel in Brooklyn where he arrived about 8 a.m. He was stripped and kept naked until 11 a.m. when he was allowed to put on his shoes, socks, and underwear, and was given a blanket. He was kept that way until about 6 p.m. Malinski claimed that he was beaten by the police during that period. An alleged accomplice, Spielfogel, was brought to the hotel and placed in the room with Malinski. Shortly after their conference Malinski confessed to the police. He was kept at the hotel that night and the next three days. He was further questioned in the early hours of Saturday and at other times during the day. On Sunday, the 25th, he was taken around to spots connected with the offense for descriptive purposes and related details of the crime. On Monday, the 26th, he was taken from the hotel to the police garage where he identified the car used in the robbery. At about 5:30 on Monday he was taken to a police station and questioned. On Tuesday at about 2 a.m. he made a confession at the police station. That confession was introduced at the trial.

The United State supreme court reversed the conviction. Mr. Justice RUTLEDGE, in an opinion in which he dissented in part, commented upon the treatment of the defendant as follows (p. 426):

"Taking away Malinski's clothes is not the controlling fact in this case. It was only one feature of the initial duress. The details of this need not be repeated here. Taken altogether, the first day's proceedings weave into a pattern typical of 'third degree' method.

"This pattern was not torn apart when it 'broke' Malinski and he confessed for the first time. With that event he was not arraigned or released. His unlawful detention continued for three days and four nights. The questioning continued at frequent intervals each day and each night. Spielfogel continued to see him daily. No one else except his imprison-

ers was allowed to see him at any time. That he did not ask again to see counsel or others is but evidence that he had been 'broken.' "

In *Upshaw v. United States* (1948), 335 U. S. 410, 69 Sup. Ct. 170, 93 L. Ed. 100, the court said (footnote, p. 411):

"After the evidence was all in, the trial judge stated that without the confessions there was 'nothing left in the case.' The trial judge instructed the jury to acquit if they found that the petitioner had not confessed 'voluntarily but because he was beaten.' On this issue of physical violence the jury found against the petitioner, and therefore this issue is not involved in this case."

The court went on to discuss the law established in *McNabb v. United States* (1943), 318 U. S. 332, 63 Sup. Ct. 608, 87 L. Ed. 819, under Rule 5 (a) of federal rules of criminal procedure which requires that " 'An officer making an arrest . . . shall take the arrested person without unnecessary delay before the nearest available' committing magistrate and when the arrested person appears before the magistrate 'a complaint shall be filed forthwith.' "

Upshaw's confessions had been made during a thirty-hour period while petitioner was held a prisoner after the police had arrested him on suspicion and without a warrant.

The majority of the court held that the confession was inadmissible. The minority construed the majority opinion to be an extension of the rule laid down in the *McNabb Case* to vitiate any confession obtained after unreasonable delay in the presentation of the prisoner before a magistrate. Both opinions refer with approval to the case of *United States v. Mitchell* (1944), 322 U. S. 65, 64 Sup. Ct. 896, 88 L. Ed. 1140, in which it was held that a confession voluntarily given shortly after the prisoner was taken into custody was not rendered inadmissible by an illegal holding of the prisoner for eight days thereafter.

In the *Upshaw Case* the majority opinion said (p. 412) :

"We hold that this case falls squarely within the *McNabb* ruling and is not taken out of it by what was decided in the *Mitchell Case*. In the *McNabb Case* we held that the plain purpose of the requirement that prisoners should promptly be taken before committing magistrates was to check resort by officers to 'secret interrogation of persons accused of crime.' "

In *Watts v. Indiana* (1949), 338 U. S. 49, 69 Sup. Ct. 1347, 93 L. Ed. 1801, upon writ of certiorari the court reversed a conviction of petitioner in the circuit court for Shelby county which had been affirmed by the Indiana supreme court.

On November 12, 1947, petitioner was arrested and held as a suspected perpetrator of an alleged criminal assault. Later the same day, in the vicinity of this occurrence, a woman was found dead under conditions suggesting murder in the course of an attempted criminal assault. Suspicion of murder turned toward defendant and police began to question him. They took him from the county jail to state police headquarters where he was questioned by officers in relays from about 11 :30 that night until sometime between 2 :30 and 3 the following morning. The same procedure of persistent interrogation from about 5 :30 in the afternoons until about 3 in the mornings, by a relay of six to eight officers, was pursued on Thursday, the 13th, Friday, the 14th, Saturday, the 15th, and Monday, the 17th. For the first two days he was kept in solitary confinement in a cell aptly called "the hole" in view of its physical conditions as described by the state's witnesses. In addition to the night sessions the police intermittently interrogated Watts during the day, and on three days drove him around town for hours at a time, with a view to eliciting identifications and other disclosures.

The court, speaking through Mr. Justice FRANKFURTER, there said (p. 49):

"Although the constitution puts protection against crime predominantly in the keeping of the states, the Fourteenth amendment severely restricted the states in their administration of criminal justice. Thus, while the state courts have the responsibility for securing the rudimentary requirements of a civilized order, in discharging that responsibility there hangs over them the reviewing power of this court. Power of such delicacy and import must, of course, be exercised with the greatest forbearance. When, however, appeal is made to it, there is no escape. And so this court once again must meet the uncongenial duty of testing the validity of a conviction by a state court for a state crime by what is to be found in the due process clause of the Fourteenth amendment. . . . Especially in cases arising under the due process clause is it important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this court sits." (Cited authorities omitted.)

We approach the problem here presented with full comprehension of the reviewing authority of the United States supreme court, which we do not, however, consider as a threat. Its duty under the Fourteenth amendment is no different from the duty of this court nor the duty of the trial court; each in its own sphere has the duty to protect the appellant in this case and all persons charged with crime, that convictions be based upon proper legal principles and after due process. The issues of fact with respect to due process we consider to be the same as other issues of fact. If evidence in that particular supports the jury verdict, the finding of the jury is final; if not, then the court has the duty to upset the verdict and the judgment of conviction which rests thereon.

We recite the facts in the *Watts Case* because appellant contends that the facts in the instant case so closely parallel

those in the *Watts Case* as to require reversal. We have examined the record carefully and conclude that the contention is not supported by the evidence.

In the *Watts Case* the court said (p. 55) :

"Protracted, systematic, and uncontrolled subjection of an accused to interrogation by the police for the purpose of eliciting disclosures or confessions is subversive of the accusatorial system. It is the inquisitorial system without its safeguards."

In the *Malinski Case, supra,* the court determined that (p. 407) :

". . . the confession of October 23d was the product of fear—one on which we could not permit a person to stand convicted for a crime."

The appellant here was arrested in Minneapolis by the police of that city at the request of the Milwaukee police after the discovery of Patricia's body. After being advised by the Minneapolis police that on the charge upon which the Milwaukee police had him detained (contributing to the delinquency of a minor) he could not be required to return to Milwaukee, he appeared before a magistrate in Minneapolis and waived extradition. On Thursday afternoon he and his wife were returned to Milwaukee by airplane with full knowledge of the community and the parents of both. His brother attempted to talk to him at the airport but was sent from the police car by the officers who took appellant and his wife to the Milwaukee city jail.

At the jail the relatives were permitted to see and talk with the appellant for forty-five minutes. His counsel complains that such conversations had to be in the presence of officers who constantly came to and went from the room in which the visitation was permitted. If the point is material, the record does not bear out the argument of appellant's counsel. Officer Mazurkiewicz testified that he

went into the room several times for the purpose of putting the belongings of Kathleen and Patricia into the room, but that other than that nobody entered and no one spied on them because he stood outside the door at all times. The relatives and friends were then advised to stay in that office and Milton was taken into Captain Kraemer's office. He was advised of his constitutional rights and questioned generally about his activities. After such questioning he was permitted to join his wife in another room where they were served a meal procured from Deutsch's Restaurant by his brother and one of the detectives. About forty-five minutes were spent over this meal, during which time they had an opportunity to talk, although there was an officer in the room with them. When the meal was finished appellant's wife and other relatives were advised that Milton would be kept in custody, that Kathleen would be released but that she was to report to the police office the following day. They were then sent home and Milton was lodged in the cell block of the city jail. There was no request at that time for counsel because, as appellant testified, he thought he did not need any.

The next afternoon appellant was taken to Captain Kraemer's office on two occasions for identification purposes. He was viewed by the salesman of Flintrop sporting-goods store who had sold the pistol, and by a witness who had seen him near the intersection where he had met Patricia on the afternoon of her disappearance.

Friday evening, beginning at about 8:30, he was questioned in Captain Kraemer's office by the captain and several officers. This conversation consisted largely of inquiry by Babich as to how easily and quickly the case could be disposed of, how it could be handled with the least number of witnesses and whether the officer could arrange to keep secret the matter of Kathleen's pregnancy. While he was discussing this with Detective Zajdel, Captain Kraemer entered the room and asked him whether he was alone when

he killed Patricia, to which he said, "Yes, I was alone." Captain Kraemer then asked, "What did you do with the gun?" and Milton answered, "I will tell you that in the morning; I will give you a statement in writing." Soon after this he was returned to his cell where he was provided with a mattress, blanket, and pillow.

While it appears that he spent the first night on a wooden cot or shelf, without any comforts, it also appears that that is the regular city jail accommodation and that all who are brought in for a night get the same treatment.

On Saturday morning the appellant was taken to Captain Kraemer's office and advised that a petition for writ of *habeas corpus* had been made in his behalf. He was then taken to the court of Circuit Judge Roland Steinle. In court there were present the district attorney, a defense attorney, Edward T. Berkanovic, and members of appellant's family. The appellant was in custody of two officers. The hearing on the writ was adjourned until 2 p.m. at the request of the district attorney to enable him to prepare a return. At 1:15 the district attorney had the appellant brought to his office where he took an unsigned confession.

Appellant makes much of the fact that at the morning court appearance he was flanked by two officers and his wife was not permitted to talk to him in the corridor.

There was no request by the appellant or his attorney to converse in the courtroom and there is no reason to believe that such request, if made, would have been denied.

At the afternoon hearing the writ was denied.

On Sunday he was allowed to visit with his family and another meal was brought from the outside.

In oral argument appellant's counsel attempted to make it appear that those were about the only meals appellant had while in custody. It appears, however, from his own testimony that he was served the usual jail fare with the other prisoners at the usual times.

On Monday, March 28th, the appellant was arraigned on the charge of murder. At that time Mr. Richter, one of his attorneys, examined him in an attempt to secure bail:

"Q. Now if you were released on bail would you behave yourself? A. I certainly would.

"Q. You don't have any ideas of committing suicide? A. No, sir.

"Q. You feel now that you have told the district attorney what you have told him, that you got this matter off of your conscience and you don't want to run away or anything like that, do you? A. No, sir."

There seems to have been no suggestion up to that time of abuse or coercion or other violation of appellant's constitutional rights. At the trial there appears to have been a studied effort to make the facts fit the practices frowned upon by the United States supreme court in the due-process cases.

We are satisfied that the jury was justified in discounting such attempts and that the trial court properly admitted and the jury properly gave credence to the confessions as voluntary admissions.

## II.

Counsel for appellant next argued that prejudicial error occurred in the trial.

The district attorney in the absence of the jury offered to prove by a witness, Ruth Miller, that in a conversation on a bus while she and Kathleen were returning from looking for Patricia, Kathleen had said that Milton had told her that he hated Pat so much he would do anything to her, even kill her. On cross-examination Kathleen had denied that Milton had ever made such remark. The trial court therefore ruled that Ruth Miller's proposed testimony would be material for the purpose of impeaching Kathleen as a witness.

When the jury returned to the courtroom the district attorney put questions to the witness Miller but her answers indicated that she could not testify to any such conversations

with Kathleen. The testimony was then stricken and the jury instructed to disregard it. After a couple of other witnesses were called the district attorney recalled Ruth Miller and again attempted to get an affirmative answer to his question as to whether she and Kathleen had had such conversation, and at that time the witness stated that there had been no such conversation.

While the district attorney was persistent and error was committed, the trial court very promptly ruled that all of such testimony of Ruth Miller was incompetent and ordered it stricken and instructed the jury that the testimony given by her on both occasions upon the stand was stricken and was to be disregarded by it. We are satisfied that because of the trial court's manner of handling the situation no prejudice resulted to the appellant.

### III.

Counsel urges that appellant was not afforded a fair trial because of newspaper publicity preceding the trial, as evidenced by the fact that one juror was disqualified for having expressed an opinion of appellant's guilt before the trial commenced. This juror concealed his true feelings during the examination on *voir dire,* but his disqualification was discovered and he was removed from the jury before the trial.

Counsel argues that the court should determine this case upon what it knows as men, and that it is common knowledge that the case received wide and lurid publicity in the state press.

Counsel further asserts that at the time of taking the appellant on a tour of the points in the city of Milwaukee which were involved in the crime, notably the riverside, the police were accompanied by a police photographer and a battery of newspaper reporters and photographers.

Re-enactment of crime for the benefit of newspaper publishers is regrettable and should certainly be frowned upon

by the courts. There is no justification for law-enforcement officers feeding evidence to the press for release in advance of trial. However, if such situation did exist in this case, counsel for the appellant, who is able and experienced in presentation of cases, could have made a record of it before the trial court in the absence of the jury and before trial, if it was pertinent to the right of the appellant to be removed from Milwaukee county for trial, and he cannot now be permitted to make such motion without supporting record and for the first time in this court.

## IV.

It is contended that the trial court erred in submitting only three possible verdicts to the jury, namely, murder in the first degree, manslaughter in the fourth degree, and not guilty. Counsel claims that the appellant was entitled to have murder in the second degree and all other degrees of manslaughter submitted, and particularly was entitled to have a determination of whether the act was committed in the heat of passion. We have examined the record and find that the trial court properly refused to instruct on heat of passion or submit any of the intermediate crimes. To have done so would have been an invitation to the jury for a compromise verdict, or, at best, could have only confused it. The appellant claimed that he had no intention of discharging the weapon and that in fact it was discharged purely by accident as a result of a scuffle between him and the victim. The defense of heat of passion contemplates an intentional act by one who is partially excused because his mind and will do not act freely because he is temporarily bereft of reason by aroused passions. There was nothing in the testimony to warrant a submission of such questions to the jury.

Counsel further urges that there is no evidence that the crime was premeditated and that the trial court improperly instructed the jury with respect to premeditation. We have

examined the instructions and find that no error was committed. The theory of the state and that of the appellant were diametrically opposed on the principal point in the case. As stated, the appellant claimed it to be an unfortunate accident; the state maintained it was a deliberate and cold slaying. The testimony adduced amply supports the state's position.

The appellant stated that he bought the gun in his brother's name because he was not old enough to own one, and solely for protection of the funds which he intended to carry in cash when he should elope. The jury, however, had the right to consider the entire circumstances surrounding its purpose, together with the fact that he carried it fully loaded to a secluded meeting place for an appointment with Patricia; as well as the fact that no concrete blocks of the make fastened to the victim's leg were delivered to the construction project where he claimed to have picked it up spontaneously after the shooting, but that others of similar make were delivered in the neighborhood of the Babich home; and to conclude therefrom that his plan was laid before setting out for the appointment with Pat and all of the equipment used in the act on hand in the car.

In addition, his testimony that the two bullets must have discharged in rapid succession was refuted by the testimony of Mathews and the medical examiner. The medical examiner testified that from the blood which appeared in the wounds the neck wound was first sustained and that there was as much as a minute elapsed before the wound in the head was caused which was almost immediately fatal. Dr. Mathews testified that the cylinder of the gun when examined by him held nine shells, one and two of which were exploded and clearly showed the firing-pin mark; there was a scraping over three, four, five, and six, which indicated that the cylinder had been turned by hand against the broken edge of the firing pin and in No. 7 shell, which was not exploded, there was a three-cornered mark which in his opinion indi-

cated an attempt to discharge the gun a third time. It was his opinion that the firing pin broke on the second shot.

The director of the Wisconsin state crime laboratory, Mr. Charles Wilson, testified that laboratory tests of the jacket worn by Patricia at the time of her death indicated that the gun was in front of the left shoulder when fired once and to the rear of the left shoulder when fired a second time, which, coupled with the different angles of the two bullet wounds, would lead any reasonable mind to the conclusion that there was an interval between shots and that the position of the gun was such that it could not have possibly been held as described by appellant when the shot from the rear was fired.

We have examined all other assignments of error and find them to be unfounded.

*By the Court.*—Judgment affirmed.

* Motion for rehearing denied, without costs, on March 6, 1951.