UNITED STATES of America, Plaintiff,

v.

Susan BARBER, Defendant.

Cr. 619L.

United States District Court
D. Nebraska.

Sept. 20, 1968.

Duane L. Nelson, Asst. U. S. Atty., Lincoln, Neb., for plaintiff.

John C. Gourlay, Lincoln, Neb., for defendant.

## MEMORANDUM and ORDER

**VAN PELT, District Judge.**

This matter, after a hearing and the submission of a brief by the defendant, now stands submitted before this court. The question to be decided is a crucial one; it concerns the admissibility or inadmissibility at defendant's upcoming trial of certain statements made by the defendant to special agents of the United States Secret Service. Needless to say, the statements are damaging to the defendant's potential chances of success at her trial.

The following statement of the facts was gleaned from the hearing on the motion. On January 18, 1968, the defendant was apprehended by the police department for the city of Lincoln, Nebraska, at approximately 5:00 in the afternoon. She was arrested under a warrant issued by the United States Commissioner for allegedly passing counterfeit federal reserve notes in Lincoln earlier that same day. Defendant was placed in a police car and was accompanied by Mrs. Hulda Roper, a policewoman. Mrs. Roper subsequently stated that the defendant was "extremely nervous." Mrs. Roper informed the defendant of her constitutional rights and a conversation ensued that the court deems not to be in issue here. Defendant was taken to police headquarters where she was interrogated for approximately one hour. Defendant admitted having spent some bills in Lincoln that day but denied any knowledge of the fact that the bills were counterfeit.

At approximately 6:00 to 6:30 that evening the defendant was taken to the office of the United States Commissioner. It is uncontroverted that during the time spent at the Commissioner's office the defendant remained extremely nervous and distraught. It is also uncontroverted that she was feeling the effects of excessive consumption of alcoholic beverages, if she was not in fact legally intoxicated. Defendant, in her testimony, stated that she had been drinking continuously from 2:00 that afternoon until the time of her arrest. The previously filed complaint was read to her during this time and she was again informed of her constitutional rights. These rights, including the necessity of appointing a lawyer, were explained and discussed. It is also uncontroverted that the defendant expressed the desire to obtain a lawyer, either by means of having one appointed or by employing her own lawyer.

The United States Commissioner made the determination that the defendant did not have sufficient funds to employ counsel on her own, but being informed that the defendant's parents resided in Lincoln, decided to explore the possibility of their having the means, as well as the desire, to employ counsel for their daughter. With this decided, the defendant

was taken from the Commissioner's office, and, according to the Commissioner's testimony, she was in about the same condition as she had been when she had arrived some two hours before. She had cried almost incessantly during her entire two hours at the Commissioner's office.

From the Commissioner's office the defendant was returned to the Lincoln Police headquarters. The time of arrival was shortly after 9:00 P.M. Defendant's rights were read to her again from a form and which form was then signed by the defendant. She had been booked, and after her rights were read to her, two agents from the United States Secret Service, under orders, began to interrogate the defendant. This interrogation ran for approximately one hour. During this time the defendant answered questions but denied any knowledge that the bills were in fact counterfeit. Her nerves were still unsettled. At approximately 11:00 P.M. Special Agent Roth, the Agent in charge, inquired of the two agents who had finished interrogating her as to the results of their questioning. When informed that defendant denied any knowledge of the counterfeit bills, Agent Roth commenced to question the defendant himself. This session, too, lasted approximately one hour. Present during this session were the other two agents, a police matron, and one Richard Barber, who is, apparently, a friend of the defendant. It was during this period of time, between 11:00 and 12:00, that the defendant changed her prior story and admitted that she knew that the bills were counterfeit. Again, all parties agree that during this time her comportment ranged from extreme nervousness to emotional hysteria.

It appears that during the last interrogation at least two of the agents told the defendant that their main concern was in determining who had made the bills, and discussed the possibility of the defendant being turned loose, and that they wanted her assistance. It also appears that the defendant at no time

during this questioning asked for a lawyer, or asked that the process of interrogation be stopped. In addition, Mrs. Roper and the three agents all testified that no one made any promises or threats to the defendant.

The next morning, January 19, 1968, the defendant was returned to the Commissioner's office. In the interim the Commissioner had learned from the defendant's parents that they were unwilling to procure the services of an attorney for their daughter. Counsel was then appointed. Defendant now seeks to suppress the damaging statements that she made in the presence of the three Special Agents, the policematron, and Richard Barber.

Defendant, in her brief, states that the confessions and admissions that were made are inadmissible for three separate reasons:

"(1) Defendant was denied her right to counsel;

(2) The government has failed to carry its burden of showing a valid waiver by defendant of her right to remain silent and her right to counsel;

(3) The confessions are not voluntary in the constitutional sense." (At page 1 of defendant's brief.)

The court agrees that these issues are before it now; however, this court is also of the opinion that certain other factors must also be considered.

■ At the outset, it must be determined what impact, if any, does the "Omnibus Crime Control and Safe Streets Act of 1968", Public Law, 90–351, 90th Congress, H.R. 5037, June 19, 1968, 82 Stat. 197, have on the present situation. See U.S.Code and Cong. and Admin.News, June 5 to June 28, 1968, at page 1495, 1509. We quote:

"Sec. 701. (a) Chapter 223, title 18, United States Code (relating to witnesses and evidence), is amended by adding at the end thereof the following new sections:

§ 3501. Admissibility of confessions

"(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances."

The act then continues to put forward certain elements to be considered in determining voluntariness. This court need not pass on the obviously grave constitutional questions that spring from this enactment. See, Miranda v. State of Arizona, 384 U.S. 436, 490–491, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); U.S. Code Cong. and Admin.News, supra, at page 1732, et seq. Suffice it to say, that at this point in time, it is enough for this court to decide that § 3501, supra, is not to be applied retroactively. Prior to the enactment of the Omnibus Crime Control and Safe Streets Act of 1968 (hereafter referred to as the Act of 1968), the Supreme Court had held in Miranda, supra, that a confession obtained from a defendant during custodial police interrogation could not constitutionally be used in evidence against the defendant unless certain specific procedural safeguards were followed. These safeguards were based on the defendant's privilege against self-incrimination under the Fifth Amendment to the Constitution of the United States. They are:

1) That the defendant be advised that he has a right to remain silent and that anything he says may be used against him.

2) That the defendant must be advised that he has the right to consult with a lawyer and to have a lawyer with him during the interrogation.

3) That the defendant must be informed that if he cannot afford a lawyer, that a lawyer will be appointed for him.

There is ample evidence to support the fact that the defendant was so warned in the present case. Miranda, however, went further. The Court stated that although the defendant could waive these rights, a heavy burden of proof rests on the prosecution to demonstrate that the waiver was made knowingly and intelligently. These "rights" under Miranda have now been relegated to a position of "consideration" of voluntariness under § 3501(b) of the Act of 1968. This court is unwilling to say that what were constitutional rights until a few months ago can be relegated to a lesser position retrospectively, even by the Congress of the United States.

The court now turns to a consideration of the Criminal Justice Act of 1964, 18 U.S.C.A. § 3006A, and more particularly 3006A(b). It provides:

"In every criminal case in which the defendant is charged with a felony or a misdemeanor, other than a petty offense, and appears without counsel, the United States commissioner or the court shall advise the defendant that he has the right to be represented by counsel and that counsel will be appointed to represent him if he is financially unable to obtain counsel. Unless the defendant waives the appointment of counsel, the United States commissioner or the court, if satisfied after appropriate inquiry that the defendant is financially unable to obtain counsel, shall appoint counsel to represent him. * * * "

In the present case, the Commissioner was making his "appropriate inquiry" as to whether or not counsel should be appointed. It is conceded that the defendant did not waive her right to counsel before the Commissioner. The question thus becomes whether or not the defendant can, such as in the present situation, waive the right to counsel to

the law enforcement authorities while the Commissioner is making his "appropriate inquiry." Defendant, appropriately, notes in her brief that there are no sanctions available for a violation of this statute. She points out that to allow the police to cajole, persuade, etc. the defendant to waive her right to counsel in the instance where there is a delay in the appointment of counsel would run contrary to the spirit of § 3006A(b) as well as Rule 44 of the Fed.R.Crim.P., 18 U.S.C.A. See 4 Federal Practice & Procedure, Barron-Holtzoff, § 2461, 1967 Pocketpart, 200. This court agrees. The act obviously seeks to assure that everyone, rich or poor, will have the opportunity to utilize the services of an attorney as early in the proceedings as is possible. Congress must certainly have been well aware of the fact that any good attorney will advise his client to say nothing, for it has been stated often enough by the judicial branch of the government. With this in mind, and with the intention of Congress to insure an early appointment, it is difficult to arrive at the conclusion that having been before a Commissioner and expressed a desire to obtain counsel, as is the case here, either by retention or appointment, a defendant can waive the right to counsel to the police during the delay in determining whether or not one should be appointed.

■ To support the enforcement of § 3006A(b) the defendant urges upon this court adoption of a rule analogous to what is commonly referred to as the McNabb-Mallory rule [McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479 (1957)]. This rule deals with the prompt production of an accused before a magistrate as is required by Rule 5(a) of the Fed.R.Crim.P. and the subsequent inadmissibility of a confession, whether it be voluntary or involuntary, for the failure to do so. The defendant states that Rule 44 and § 3006A(b) be enforced in the same manner; that is, when, at the initial appearance before a commissioner a counsel is not appointed be it for valid or invalid reasons, any subsequent confession would be inadmissible whether or not the confession complied with other constitutional standards. This court, however, refuses to adopt this line of reasoning for three reasons. (1) It is not convinced of the soundness in adopting the McNabb-Mallory reasoning to Rule 44 and § 3006A(b) at the initial appearance before a commissioner. There may be cases, as in the present case, where the commissioner feels that it is his duty to make inquiries that take a matter of time before he feels justified in appointing counsel for a particular defendant. (2) The McNabb-Mallory Rule has also apparently been amended by § 3501 of the Omnibus Crime Act of 1968. See, Senate Report 1097, U.S.Code Cong. and Admin.News, 90th Cong., 2d session, pp. 1634, 1645 et seq. and any analogous rule might well meet a similar fate. (3) It is not necessary to fashion such a rule in the present case for this court is of the opinion that the prosecution has failed to meet the standards set forth for proof of waiver of a constitutional right in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We do not decide, however, whether or not, after an initial engagement before a magistrate, a defendant can waive his constitutional right to counsel.

In Johnson v. Zerbst, supra, the Supreme Court said:

"It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must

depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." At page 464, 58 S.Ct. at page 1023.

In Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962) the Court stated that:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

In the present case there is ample evidence to show that the defendant was informed of her constitutional right to counsel. She signed a form indicating that she had been so informed; there was also uncontroverted testimony to that effect. But it must also be noted that there is nothing in the record to indicate that she knowingly and intelligently waived her right to counsel after she had expressed the desire to have counsel either retained by or appointed for her. In addition, she was returned to the Commissioner the morning following her damaging statements and counsel was then appointed, which would seem to indicate that she was unaware of having waived anything.

Finally, in *Miranda,* supra, the Court stated:

"This Court has always set high standards of proof for the waiver of constitutional rights, [citation omitted] and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact obtained. * * *" At page 475, 86 S.Ct. at page 1628.

No one can doubt that the defendant was "in custody". See *Miranda,* supra, at page 444, 86 S.Ct. 1602. There is no statement that defendant did not want an attorney. All indications point to the fact that she did want an attorney. It is stated that at the last interrogation the defendant talked without being made promises or being threatened. But the facts also show that she had earlier requested an attorney, that she had been drinking heavily for a greater portion of the afternoon, that she had undergone interrogation twice before, that certain inducements were at least "discussed", that she feared that her cohort would harm her or her children, and, perhaps most important, that she was emotionally distraught, if not in an actual state of emotional hysteria, almost continually from the time she was arrested until the damaging statements were elicited from her. Under these conditions, and absent any more persuasive showing by the United States, it cannot be stated that the government has carried the "heavy burden" required to show waiver of a constitutional right.

Therefore, this court hereby finds that defendant did not intelligently and knowingly waive her right to counsel, and the confessions and admissions elicited from her in the absence of counsel must be suppressed. It is, consequently the order of this court that the defendant's motion to suppress should be and hereby is sustained.

Because of the manner in which the court disposed of the motion to suppress, it is unnecessary for the court to reach the issue as to voluntariness of the confession.