**UNITED STATES of America,**
**Plaintiff,**

v.

**Victor Harry FEGUER, Defendant.**

**Cr. No. 6031.**

United States District Court
N. D. Iowa, E. D.

March 2, 1961.

378

F. E. Van Alstine, U. S. Dist. Atty., Sioux City, Iowa, for plaintiff.

Paul L. Kildee and Frederick G. White, Waterloo, Iowa, for defendant.

GRAVEN, District Judge.

On the evening of July 11, 1960, Edward Roy Bartels, a medical doctor engaged in the general practice of medicine in the City of Dubuque, Iowa, left his home in that city in response to a call for his services. He left on the call driv-

ing a 1959 Nash Rambler. He was never seen alive again. Some days later his body was found in an isolated area in Jo Daviess County, Illinois. That county is located directly across the Mississippi River from the City of Dubuque. He had been killed by a bullet which had entered his head from the back. The 1959 Nash Rambler driven by Doctor Bartels at the time of his disappearance was next located in the possession of the defendant at Birmingham, Alabama, on July 20, 1960.

On August 9, 1960, a Grand Jury for this District returned an Indictment against the defendant. The Indictment is as follows:

"The Grand Jury Charges:

"That Victor Harry Feguer, on or about the 11th day of July, 1960, in violation of Section 1201(a), Title 18, United States Code, did knowingly transport in interstate commerce from Dubuque, Dubuque County, in the Eastern Division of the Northern District of Iowa, into the State of Illinois, one Edward Roy Bartels, a person who had theretofore been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away by the defendant, and held by said defendant for ransom, reward, robbery, homicide, and for other reasons to the Grand Jurors unknown. The said Edward Roy Bartels was not liberated unharmed.

"A True Bill
/s/ Vern M. Lovely
Foreman"

The defendant is awaiting trial on that Indictment. He has filed herein a motion, later amended, stating that certain listed property has been taken from him by Agents of the Federal Bureau of Investigation by unreasonable search and seizure. He asks that the property be returned to him and that it be suppressed from use in evidence against him in the trial. He also filed herein a motion stating that Agents of the Federal Bureau of Investigation failed to take him before a magistrate without unnecessary delay contrary to the provisions of Rule 5 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. He asks that any statements, purported admissions, or confessions made by him during the period of delay be suppressed from use in evidence against him at the trial. In that motion he also alleges that any statements, purported admissions, or confessions made by him during the delay were involuntarily made by him. He asks that they be suppressed from use in evidence against him at the trial.

The motion relating to the suppression of property alleged to have been the subject of unreasonable search and seizure was made before trial under the provisions of Rule 41(e), Federal Rules of Criminal Procedure. Neither the Federal Rules of Criminal Procedure nor the Federal statutes make any specific provision for the suppression, prior to trial, of incriminatory statements alleged to have been made during the period in which an accused was allegedly withheld from arraignment in violation of Rule 5 of the Federal Rules of Criminal Procedure or alleged to have been involuntarily made. However, since the Court would have to hold a hearing in the absence of the jury on the question of the admissibility of any alleged incriminatory statements, this Court deemed it desirable to hold the hearing on that matter in advance of trial. Since the motion relating to search and seizure and the motion relating to the alleged incriminatory statements are somewhat closely related, the Court ordered the hearings on both motions held at the same time. In the order setting the motions for hearing, the Court ordered the Government to produce at the hearing all those who had to do with the arrest of the defendant and the search resulting in the seizure of the property referred to in the defendant's motion relating to search and seizure. The Court further ordered that the Government should produce at the hearing those familiar with the facts as to the detention of the defendant following his arrest and until his arraignment. The Court further ordered that the Government produce at the hearing evidence as to the time and place of arraignment

of the defendant, before whom the arraignment was had, and what occurred at the arraignment. At the hearing the Government produced the witnesses and evidence in accord with the Court order. A hearing of some length was held at which many witnesses were examined by the Government and cross-examined by the attorneys for the defendant. The defendant did not testify at the hearing. A transcript of the hearing was about 300 pages in length.

The Court took the motions under advisement and a few days later, but in advance of the trial, made and entered its rulings thereon. The Court stated in those rulings that its findings and opinion in connection with those matters would be filed later, which is now being done.

The defendant was arrested at Birmingham, Alabama, shortly prior to 2:00 o'clock P.M. on July 20, 1960. He was arraigned as provided by Rule 5 of the Federal Rules of Criminal Procedure in the United States Courthouse at Birmingham, Alabama, on the forenoon of July 21, 1960. It is now necessary to revert back to the day of July 20, 1960.

On July 20, 1960, one Smith Gerald Hudson was one of the persons most wanted by the Federal Bureau of Investigation of the Department of Justice. A warrant for his apprehension had been issued by the United States District Court for the Middle District of Pennsylvania, which warrant was still outstanding. He had been charged with flight to avoid imprisonment for murder in violation of Section 1073, Title 18 U. S.C. He had been convicted of murder in a state court. The Federal Bureau of Investigation had put out a descriptive bulletin stating that he was wanted by that Bureau for "Interstate Flight-Murder." That bulletin contained front and side view pictures of him and his fingerprints. In the bulletin it was stated that he should be considered as "armed and dangerous." The pictures of Smith Gerald Hudson on the bulletin portrayed him without eyeglasses.

Either on or shortly prior to July 20, 1960, a Birmingham, Alabama, newspaper had carried an account about Smith Gerald Hudson being one of the men most wanted by the Federal Bureau of Investigation. The write-up was accompanied by a picture of Smith Gerald Hudson taken from the F.B.I. bulletin concerning him. At around 10:30 o'clock A.M., on July 20, 1960, Special Agent Harry T. Posey, who was in the F.B.I. office in Birmingham, received a telephone call from a Mr. J. B. Alford. Mr. Alford was engaged in the used car business under the name of Friendly Car Motors on Third Avenue West in Birmingham. He informed Agent Posey that he had seen the picture of Smith Gerald Hudson in the Birmingham newspaper; that a man resembling Smith Gerald Hudson had a short time before driven a 1959 Nash Rambler car into his place of business; that the car bore Michigan license plates; that the driver had no title papers for the car; and that the driver had attempted to deal the car to him for an abnormally low consideration. Special Agent Clarence M. Kelly was in charge of the Birmingham office. On July 20, 1960, he was away from the office on an investigation. He did not return to the office from that investigation until around 4:00 o'clock P.M. In the meantime, Special Agent Kenneth M. Raby was in charge of the office. Upon being informed by Special Agent Posey of the information supplied by Mr. Alford, he directed Special Agent Posey to telephone the used car dealers in Birmingham to ascertain if the person described by Mr. Alford had been at their places of business. Special Agent Posey did so. Four other used car dealers informed Special Agent Posey that a man driving a 1959 Nash Rambler car bearing Michigan license plates had been at their places of business and attempted to dispose of the car to them.

There were a number of Special Agents of the F.B.I. stationed in Birmingham. Those Special Agents will be hereafter referred to as Agents. Agent Womack was among the Agents

stationed in Birmingham. Agent Raby directed Agent Womack to interview those who had seen the driver in question. Before proceeding with the interviews, Agent Womack had been given glossy prints made of the pictures of Smith Gerald Hudson appearing on the bulletin. Those prints presented better portrayals of Smith Gerald Hudson than did the pictures appearing on the bulletin. Agent Posey interviewed Mr. Alford. He also interviewed Mr. Baker, an employee of Mr. Alford, who had also seen the driver of the car in question. The driver of that car wore glasses. Agent Womack displayed the glossy print pictures of Smith Gerald Hudson to Mr. Alford and Mr. Baker. They both stated that, except for the glasses, the driver of the car resembled Smith Gerald Hudson. Agent Womack was informed by Mr. Alford that there was a passenger in the car. Agent Womack proceeded to interview some of the other places of business where the driver had called in an attempt to dispose of the car. When the picture of Smith Gerald Hudson was displayed, some of them thought the man portrayed resembled the driver of the car; others thought the man portrayed resembled the passenger in the car.

The F.B.I. Agents in and around Birmingham were alerted by the Birmingham office to be on the lookout for a 1959 Nash Rambler car bearing Michigan license plates. They were informed that several people who had seen the driver had stated that he resembled Smith Gerald Hudson. They were also informed he was attempting to dispose of the car at an abnormally low price and that he had no "title" papers to the car. It had been reported that the Michigan license plates on the car contained the letter "X." One of the F.B.I. Agents (Agent Kemp) who had been alerted had at one time been stationed in Michigan. He knew that the letter "X" on the license plates meant that it was owned by a Michigan municipality. The driver of the car in question had called at the places of business of several used car dealers in an attempt to dispose of the car. Because of the peculiar circumstances under which the car was being offered for sale, the used car dealers to whom it was offered refused to deal for it.

Sometime shortly after 1:00 o'clock P. M., Agents Arnett and Sanders, who were on the lookout for the car, received word that a car corresponding to the car in question had been seen in the vicinity of the corner of 5th Avenue and 13th Street. They proceeded by car to that point. They then received word over the F.B.I. radio that the car had been seen in the vicinity of 5th Avenue and 29th Street. They proceeded to that point and observed the car parked at an automobile junk yard. As they approached, the car was started up and driven east on 5th Avenue North where it turned into another automobile junk yard. In the meantime Agents Kemp and Brown in one car, Agents Alexander and Raby in another car, and Agent Pert in another car, arrived in the vicinity. The Agents in their cars followed the car in question into the junk yard and blocked its path. Agent Arnett proceeded to the driver's side of the car and Agent Sanders went to the other side of it. Those Agents approached the car with guns in hand and informed the occupants of the car that they were F.B.I. Agents. The occupants of the car were ordered out of the car and handcuffs were placed on the driver. The driver and the passenger were then searched for weapons. The search revealed a number of bullets in one of the pockets of the driver. Agent Arnett then asked him, "Where is the gun?" The driver replied, "On the seat." Agent Kemp then reached into the car and removed a loaded gun from the front seat. Agent Raby then came over to the car. He had with him the bulletin containing the pictures and fingerprints of Smith Gerald Hudson. After checking these against the driver, he stated that the driver was not Smith Gerald Hudson and ordered the handcuffs to be removed from the driver. At or shortly before the handcuffs had been removed, Agent Raby was

informed that the "X" on the license plates meant that the car was owned by a Michigan municipality. Agent Raby made it known to the driver that he wanted to inquire about the ownership of the car. He first informed the driver that he had the right to have an attorney; that he did not need to make any statements; and that any statements he would make could be used against him. After the car was stopped, it was noticed that there was a small tab on the license plates with the name of the City of Grand Rapids on it. Agent Raby asked the driver his name. The driver stated that his name was William Lloyd Howes. He was then asked if he was an employee of the City of Grand Rapids and he reported that he was not. Agent Raby then asked if he was willing to go to the F.B.I. office so that the ownership of the car could be checked. The driver said he would be glad to get the question of car ownership cleared up. He said, "You can check all you want to and you will find that this car is legitimate, it's perfectly registered to me and it is my car." Agent Raby then inquired of the driver whether it would be all right for Agent Kemp to drive the 1959 Nash Rambler to the F.B.I. office. The driver said it would. When Agent Raby was talking with the driver of the car at the scene of the arrest, he noticed that there was a doctor's bag in the back seat of the car. He made inquiry as to how the driver had come to have it. The driver said he had acquired it in payment of a $100 gambling debt from a doctor who was an alcoholic and a drug addict. The bag was then removed from the car by the F.B.I. Agents. Around 2:00 o'clock P. M., the Agents, the driver and the passenger proceeded to the F.B.I. office. The driver was in a car with Agents Raby and Alexander. The passenger was in another car with other F.B.I. Agents. Agent Kemp drove the 1959 Nash Rambler car to the F.B.I. office. Shortly thereafter the car was parked near the F.B.I. office. The car was first checked as to the detailed descriptive information needed in order to telephone the Mich-

igan authorities to check the ownership of the car. Following the securing of that information, which was around 2:30 o'clock P.M., Agent Raby telephoned the Detroit office of the F.B.I. and gave a detailed description of the car. Around this time the driver was photographed and his fingerprints taken. At around 3:20 o'clock P.M., the Detroit office of the F.B.I. telephoned that there was no stolen report on the car but that the license plates had been stolen from a 1959 Nash Rambler that belonged to the City Health Department of the City of Grand Rapids, Michigan. When this information was imparted to the driver of the car, he then stated that his name was not William Lloyd Howes but Victor Harry Feguer. Agent Raby then went back to the telephone and telephoned the Detroit office of the F.B.I., giving it that information. Supervisor Smith of that office then informed Agent Raby that he understood that Victor Harry Feguer was wanted in Iowa for kidnapping. While Agent Raby was telephoning, Victor Harry Feguer stated to Agent Brown that the car had been stolen. Agent Raby then got in communication with Agent Gearty who was in Dubuque, Iowa, in connection with the kidnapping. Agent Gearty informed him that a federal warrant had been issued in Iowa for Victor Harry Feguer on a charge of flight to avoid prosecution for kidnapping.

Shortly after Agent Raby had received information from the Detroit office that the car was bearing stolen license plates, a quick search was made of the car by F.B.I. Agents. They found, among other items, a pillowcase containing a number of items on the back seat of the car which was removed from the car. Following the receipt of information that a federal warrant was out for Victor Harry Feguer for flight to avoid prosecution for kidnapping, the car he had been driving was thoroughly searched and quite a large number of items removed from it.

It was shortly before 5:00 o'clock P.M. when Agent Raby was informed that a

federal warrant had been issued in Iowa for the arrest of Victor Harry Feguer on the charge of flight to avoid prosecution for kidnapping. At around 4:00 o'clock P.M. Agent Kelly, who was the Agent in charge of the office, came in. He was informed by Agent Raby as to developments. Commencing shortly before 5:00 o'clock P.M., Agent Kelly started to try to locate a magistrate before whom Victor Harry Feguer might be taken in accordance with the provisions of Rule 5 of the Federal Rules of Criminal Procedure. There was a United States Commissioner in Birmingham whose office was in the United States Courthouse. Inquiry revealed that the Commissioner was away on a vacation. There were two resident Federal District Judges in the City of Birmingham. Agent Kelly called the Judges' Chambers and was informed that neither of the Judges were there.

At around 10:00 o'clock A.M. on July 21, 1960, in a court room of the United States Courthouse at Birmingham, Alabama, the defendant was brought before Federal District Judge Harlan H. Grooms as committing magistrate for proceedings under Rule 5 of the Federal Rules of Criminal Procedure on the charge of having fled to avoid prosecution for kidnapping under the provisions of Section 1073, Title 18 U.S.C. Judge Grooms first appointed Hugo L. Black, Jr., a competent and experienced lawyer, to assist the defendant. Proceedings were then had in accord with the provisions of Rule 5. The defendant waived his right to a preliminary examination. Bail was fixed in the amount of $25,000. Because the warrant had not arrived from Iowa, the matter of removal under that warrant was continued. Thereafter, that warrant arrived from Iowa. There also arrived from Iowa a warrant charging the defendant with the crime of kidnapping in violation of Section 1201(a), Title 18 U.S.C.

On the forenoon of July 25, 1960, at a courtroom of the United States Courthouse at Birmingham, Alabama, the defendant was brought before Federal District Judge Harlan H. Grooms as committing magistrate for proceedings under Rule 5 of the Federal Rules of Criminal Procedure on the Iowa charge of having kidnapped Edward Roy Bartels in violation of Section 1201(a), Title 18 U.S.C. Hugo L. Black, Jr., was not then available. Judge Grooms first appointed William Mitch, a competent and experienced lawyer, to assist the defendant. Proceedings were then had in accord with the provisions of Rule 5. The defendant waived preliminary examination. Following the proceedings under Rule 5, the defendant signed his consent to the removal to Iowa under the warrant issued on the kidnapping charge.

In the present case, Victor Harry Feguer, hereafter referred to as the defendant, was arrested without a warrant. No search warrant was issued for the search of his person or the car he was driving. In the present case, the arrest was made by F.B.I. Agents. Section 3052, Title 18 U.S.C.A., provides, in part, that:

> " * * * agents of the Federal Bureau of Investigation of the Department of Justice may * * * make arrests without warrant * * * for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed * * * such felony."

At one time, what is now Section 3052 provided that the F.B.I. Agents could only make an arrest without warrants where the felony had been committed and that there must have been a likelihood of the person escaping before a warrant could be obtained for his arrest. See United States v. Coplon, 2 Cir., 1950, 185 F.2d 629, 634, 634, 28 A.L.R.2d 1041. The Congress subsequently removed those provisions from the Section.

The term "probable cause" as used in the Fourth Amendment and "reasonable grounds" are substantial equivalents. Draper v. United States, 1959, 358 U.S. 307, 310 (footnote 3), 79 S.Ct. 329, 3 L.Ed.2d 327. The latest

pronouncements of the Supreme Court of the United States on the matter of an arrest without warrant are contained in the case of Henry v. United States, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134. In that case the Court states (361 U.S. at page 102, 80 S.Ct. at page 171):

"Evidence required to establish guilt is not necessary. * * * On the other hand, good faith on the part of the arresting officers is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. * * * If the officer acts with probable cause, he is protected even though it turns out that the citizen is innocent. * * * And while a search without a warrant is, within limits, permissible if incident to a lawful arrest, if an arrest without a warrant is to support an incidental search, it must be made with probable cause. * * *"

The Court goes on to state (361 U.S. at page 102, 80 S.Ct. at page 171) that the test is what "prudent men in the shoes of" arresting officers would believe the situation to be.

In the case of Brinegar v. United States, 1949, 338 U.S. 160, at page 175, 69 S.Ct. 1302, at page 1310, 93 L.Ed. 1879, the Court stated:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. * * *"

In the same case, the Court further stated (338 U.S. at pages 175–176, 69 S.Ct. at page 1310):

" * * * Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. * * *

"These long prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

Rule 5(a) of the Federal Rules of Criminal Procedure provides, in part:

"An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. * * *"

In the case of Mallory v. United States, 1957, 354 U.S. 449, at pages 454–455, 77 S.Ct. 1356, at page 1359, 1 L.Ed.2d 1479, the Court stated:

"The scheme for initiating a federal prosecution is plainly defined. The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be

advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt."

The Federal Rules of Criminal Procedure became effective on March 21st, 1946. Around three years prior thereto, the United States Supreme Court decided the case of McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. The defendant in that case was charged with the murder of an officer of the Alcohol Tax Unit of the Bureau of Internal Revenue engaged in the performance of his official duties. It appeared that following arrest the defendants were repeatedly questioned for around two days without being taken before a magistrate. The United States Supreme Court stated that the Federal statutes relating to arrest all indicate that a person who has been arrested for having allegedly committed a Federal offense should be promptly brought before a magistrate. The Court held that the confessions secured under conditions described in that case should not have been admitted into evidence. The Court went on to state (318 U.S. at page 346, 63 S. Ct. at page 615): "The mere fact that a confession was made while in the custody of the police does not render it inadmissible."

The case of United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L. Ed. 1140, followed the McNabb case. In the Mitchell case the Court stated (322 U.S. at page 68, 64 S.Ct. at page 897) that the McNabb decision was an exercise of the Court's "duty to formulate policy appropriate for criminal trials in the federal courts." In the Mitchell case, the charge involved was that of breaking and entering. Upon being arrested on what appeared to be adequate grounds, the accused was taken to a police station. Shortly after arriving there, he admitted his guilt, told the officers of various items of stolen property to be found in his home, and consented to their going to his home to recover the property. He was not arraigned until eight days later. At the trial he sought to exclude the statements made by him shortly following his arrest under the doctrine of the McNabb case. The United States Supreme Court held that the statements were admissible. The Court stated (322 U.S. at page 70, 64 S.Ct. at page 898):

"But the circumstances of legality attending the making of these oral statements are nullified, it is suggested, by what followed. For not until eight days after the statements were made was Mitchell arraigned before a committing magistrate. * * * But in any event, the illegality of Mitchell's detention does not retroactively change the circumstances under which he made the disclosures. * * *"

The case of Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L. Ed. 100, arose subsequent to the effective date of Rule 5 of the Federal Rules of Criminal Procedure. In that case the accused was arrested on suspicion without a warrant. He confessed thirty hours later before having been taken before a committing magistrate as required by Rule 5. The reason given by the arresting officer for the delay in arraignment was that there was not enough evidence to hold the accused and the police wished to question him further. The United States Supreme Court held the confession inadmissible. In the case of Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, heretofore referred to, the Court stated that the adoption of Rule 5 implied no relaxation of the McNabb doctrine that one arrested must be arraigned "without unnecessary delay." It is well settled that an arrest is not justified by what a search subsequent to the arrest discloses. Henry v. United States, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134.

It was heretofore noted that the United States Supreme Court stated that where there is probable cause for arrest the arrest is not rendered unlawful by the fact that it develops that the person arrested was in fact innocent. It was also heretofore noted that in the same case where there was probable cause for arrest the arresting officers may with propriety "book" the person arrested before proceeding to take him before a committing magistrate. It may on occasion happen that an unfortunate combination of circumstances may give rise to probable cause for the arrest of a person who is in fact innocent and that sources of information which can be readily checked may satisfactorily explain away the unfortunate combination of circumstances which afforded probable cause for the arrest. The possibility of that situation arising was recognized by the United States Supreme Court in the Mallory decision in which it stated that where an arresting officer has probable cause for arrest it would be proper for the arresting officer to check readily available sources of information as to the charge upon which the person was arraigned before proceeding to bring the arrested person before a committing magistrate. This rule would seem to be especially applicable where the arrested person gives a version of the situation which could be readily checked and which version, if found correct, would justify the immediate release of the arrested person without taking him before a committing magistrate.

The rules of law heretofore discussed will next be considered in connection with the several situations disclosed by the evidence in the present case.

On the basis of trustworthy and reliable information and the peculiar surrounding circumstances, the F.B.I. Agents in Birmingham believed and prudent men in their situation would have believed that they were confronted with the situation of a reputed killer, wanted on a federal charge for flight and a state charge for murder, reportedly armed and dangerous, being at large in Birmingham. That situation was manifestly fraught with dangerous potentialities in the matter of human life.

■■ It is clear and the Court holds and finds that, immediately prior to the arrest of the driver, reasonable grounds existed for his arrest and that prudent and reasonable men possessing the information possessed by the F.B.I. Agents would have made the arrest. The Court finds and holds that the arrest was a lawful arrest. The only items which were searched for and seized at the time of the original arrest were the gun in the front seat of the car and the bullets in the pocket of the driver. Shortly thereafter, the doctor's bag was removed from the car. The Court finds and holds that the items just referred to were searched for and seized incident to a lawful arrest.

While the principal concern of the F.B.I. Agents at the time they stopped the car and placed the driver under arrest was to apprehend a reputed killer, they also knew that the driver had been attempting to dispose of a car bearing the license plates of a state many state lines away; that he had no title papers indicating his ownership of the car; that the driver, after first attempting to dispose of it to used car dealers for an abnormally low consideration, had then apparently sought to dispose of it at junk yards which bought cars for wrecking purposes; and that business men to whom the car had been offered refused to deal for the car because of the peculiar circumstances. Agent Raby also knew immediately following the original arrest that the ostensible ownership of the car was in the City of Grand Rapids, Michigan. Agent Kemp, who participated in the arrest, knew before the arrest that the letter "X" on Michigan license plates meant a car bearing them was owned by a Michigan municipality.

■ Immediately following the original arrest, Agent Raby, having made a comparison between the driver and the information contained in the bulletin relating to Smith Gerald Hudson, decided that the driver was not Smith Gerald

Hudson. He then ordered the handcuffs removed from the driver. The driver was then informed that he need not make any statements and that any statements he made would be used against him and that he was entitled to an attorney. It appears that thereafter the driver went without objection to the F.B.I. office. However, to regard the driver as not being restrained from his liberty following the removal of the handcuffs would be to indulge in a fiction. It is clear that if the driver had attempted to depart he would have been restrained by the F.B.I. Agents. In a situation involving the stopping of a car by F.B.I. Agents, the Court, in the case of Bolger v. United States, D.C.1960, 189 F.Supp. 237, at page 251, stated: "Arrest is not a question of semantics and this was an arrest no matter what the officers chose to call it." In the case of Henry v. United States, supra, 361 U.S. at page 103, 80 S.Ct. at page 171, the United States Supreme Court stated, "When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete." It seems clear and the Court so holds and finds that the driver of the car was at all times under arrest from and after the time he was first apprehended.

 After it was decided that the driver was not Smith Gerald Hudson, the F.B.I. Agents were then of the view that instead of dealing with a reputed killer they were dealing with an interstate car thief and that handcuffing was no longer required. The removal of the handcuffs did not terminate the arrest. The F.B.I. Agents had reasonable grounds for believing that the driver of the car had stolen the car in Michigan and had driven it across the state lines to Birmingham in violation of the Dyer Act, Section 2312, Title 18 U.S.C.A. The Court finds and states that prudent and cautious men having the information possessed by the F.B.I. Agents would have had reasonable grounds for believing that such was the case. It would seem that prudent and cautious men possessing the information possessed by the F.B.I. Agents would not, after the driver's handcuffs had been removed, have returned the loaded gun to him and allowed him to depart with the car. It seems clear that the continued restraint of the driver by the F.B.I. Agents under the conditions and circumstances constituted proper and lawful arrest. It is possible to imagine a situation where a person could be driving and attempting to dispose of at an abnormally low price a car bearing the license plates of a distant state which indicated ownership by a municipality in that state and such person was lacking in any papers indicating that he had title to the car but who nevertheless had not been guilty of criminal conduct in connection with the car. If such a driver were apprehended for the theft of the car and he claimed that, notwithstanding the incriminating conditions and circumstances, he was the legitimate owner of the car and that such fact could be ascertained from sources readily available, the refusal of the arresting officers to take the trouble to resort to such sources before proceeding to bring him before a committing magistrate might well be the subject of criticism.

The search of the car made at the junk yard and the search of it made soon after it was driven to the vicinity of the F.B.I. office did not furnish the grounds for the arrest of the driver for an apparent violation of the Dyer Act. Reasonable grounds for the arrest of the defendant for a violation of that Act existed at the time of the arrest. What was found in the car as the result of the first two searches did not add anything of particular significance relating to the Dyer Act violation. Thus, it was not a case of arrest on mere suspicion, which is sought to be justified by what was disclosed afterwards. The apparent desire and willingness of the driver of the car to have his ownership checked could have been based on the thought that the car bore Michigan license plates apparently appropriate for a 1959 Nash Rambler and the Michigan authorities would have no record that the car had been stolen and

he would, following a telephone communication with the Michigan authorities, be allowed to depart. However, while inquiry made in Michigan did reveal that there was no record of the car having been stolen in Michigan, it also revealed that the license plates the car was bearing were stolen plates. This feature was damaging to the claim of legitimate ownership. The driver thereafter admitted his true name and that the car was a stolen car. That information required a further check and that check led directly to the information that a federal warrant was outstanding on the charge of flight to avoid prosecution for kidnapping. After that information was received, the defendant was formally notified that he was being held on that charge. During the time the driver's claim to ownership was being checked, he was under arrest for probable violation of the Dyer Act. After that check was made, he was under arrest because of the Flight Act warrant that had been issued. The situation thereafter was that he was under arrest for both the Dyer Act violation and the Flight Act violation and could be brought before a committing magistrate on either, or both, of the charges. He was, as heretofore noted, brought before a committing magistrate the next forenoon on the Flight Act charge and later brought before a committing magistrate on the Kidnapping Act charge.

In the present case, shortly before 5:00 o'clock P.M., on July 20, 1960, the investigation of the defendant's claim to ownership had been checked and found not to warrant his being released without being brought before a committing magistrate. Agent Kelly then promptly and properly sought to have the defendant brought before a committing magistrate but did not find any available. There then followed further extended interrogation of him.

■ While it is a close and troublesome question, the Court is of the view that there inheres in the teachings of the McNabb and Mallory cases the theory that where, following an arrest, the permissible activities of "booking" the arrested person and checking his version from readily available sources has been completed, the fact that a committing magistrate is not then available does not justify the officers in making use of a large part of the time intervening, until a committing magistrate is available, for the continued interrogation of the arrested person.

■ In the Mallory case it is pointed out that when an arrested person is brought before a committing magistrate, he is advised as to his right not to make any statement and of his right to the assistance of counsel. In the present case, the defendant was advised before he made any statements that he did not have to make any statements; that any statements made by him could be used against him; and that he was entitled to an attorney. In the present case, the evidence as to statements made by the defendant only covered the period up to the arraignment of the defendant on the forenoon of July 21, 1960. The evidence clearly establishes that no third degree methods were used during that period, that all of the statements made by him during that period were freely and voluntarily made, and that no threats or inducements were made at any time by the F.B.I. Agents. However, it seems clear that the applicability of the rule of the McNabb and Mallory cases does not depend upon the fact that in a particular case there were present none of the features which the rule was intended to guard against.

■ It is the ruling of the Court that under the doctrine of the McNabb and Mallory cases any statements made by the defendant between 5:00 o'clock P.M. on July 20, 1960, and his arraignment on the forenoon of July 21, 1960, are not admissible in evidence against him.

It is the further ruling of the Court that any statements made by him from the time of his arrest on July 20, 1960, and up to 5:00 o'clock P.M. on that day are admissible against him.

It is the further ruling of the Court that all of the property which is the subject matter of his motion to suppress, as amended, was properly searched for and seized as incident to his lawful arrest.